IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

STANDARD PARKING CORPORATION,

                                                        Plaintiff,

                        -against-

MAPCO AUTO PARKS, LTD.,

RICHARD GOLDSTEIN,

LESLIE GOLDSTEIN,

DAVID P. DAMELIO,

JOHN DOES #1-10

                                                        Defendants.

**JURY TRIAL
DEMANDED**

COMPLAINT

Index No. _____

Plaintiff Standard Parking Corporation ("Standard Parking") by and through its attorneys,

Nixon Peabody LLP, alleges as follows:

## INTRODUCTION

1.      This case is about illegal political favoritism in public contracting and the

betrayal of Standard Parking by its long-time business partners, defendants Richard and Leslie

Goldstein (the "Goldsteins").

2.      The Goldsteins own and control defendant Mapco Auto Parks, Ltd. ("Mapco").

For more than 20 years, Standard Parking and Mapco have been partners in a joint venture

known as A-M Monroe Parking Company ("A-M Monroe").  A-M Monroe managed and

operated the public parking facilities at the Greater Rochester International Airport under various

public contracts with the Monroe County Airport Authority ("Airport").

3.      The Goldsteins are major contributors to the Monroe County Republican party –

the political party that controls the Airport.  According to public records, the Goldstein funneled

more than $20,000 through entities they control to the Republican party in the first seven months of 2006 alone.

4.       Sometime in 2006, the former Airport director resigned his position and was replaced by defendant David P. Damelio, who became the acting Director of Aviation for the Airport.  David P. Damelio is a local Republican political operative, having previously served as the Town of Penfield Republican leader.

5.       On information and belief, the Goldsteins conspired with David P. Damelio and other persons (whose identities are not presently known to Standard Parking) to orchestrate a sham competition to steer a new parking contract to the Goldsteins alone, eliminating Standard Parking from any further involvement with the Airport.

6.       To conceal their true objective, defendants in bad faith caused the Airport to undertake a bogus request for proposal process.  Simultaneously, the Goldsteins deceived Standard Parking into revealing confidential information about its proposal by falsely claiming that they were not interested in the new contract.  The Goldsteins then tailored their proposal to Standard Parking's proposal, thus ensuring they would be selected for award.

7.       Defendants' actions are tortious, fundamentally unfair, and contrary to the law and public policy of New York State, and operated to deprive Standard Parking of its civil rights. Standard Parking seeks damages and other relief against defendants for the injuries they have caused.

## JURISDICTION & VENUE

8.       The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1332 and/or 1367.  Venue is proper because defendants reside in this district and a substantial part of the events at issue occurred in this district.

## THE PARTIES

9.          Standard Parking is a publicly-held company incorporated in Delaware and headquartered in Chicago, Illinois.  Standard Parking is the premier provider of parking and transportation services at airports in the nation.  Standard Parking has parking contracts at more than 60 airports, and operates more than 2,000 public parking facilities across the Mainland United States, Hawaii and Canada.

10.       On information and belief, Mapco is a corporation organized under the laws of New York, with its principal place of business at 488 White Spruce Boulevard, Rochester, New York.  On information and belief, Mapco is wholly owned and controlled by the Goldsteins.

11.       On information and belief, the Goldstein defendants reside in Monroe County, New York.

12.       On information and belief, David P. Damelio is the Acting Director of Aviation for the Monroe County Airport Authority (the "Airport"), and resides in Monroe County.  On information and belief, David P. Damelio is the government official principally responsible for the day-to-day operations of the Airport, including the selection of contractors.  David P. Damelio was previously the Town of Penfield Republican leader.

13.       John Does #1-10 are persons, whose identities are unknown to Standard Parking at this time, who conspired with the other defendants to injure Standard Parking or otherwise knowingly participated in, or contributed to, the wrongdoing described herein.

14.       The Airport is not presently a party to this proceeding.  Standard Parking is separately suing the Airport in an Article 78 proceeding in state court to annul the Airport's illegal and arbitrary determination to award the new contract to the Goldsteins.  The Airport is a public benefit corporation created by the State of New York to expand and improve aviation

facilities and services in Monroe County.  *See* Public Authorities Law §§ 2751, 2753.  The

Airport consists of seven members appointed by the county executive; only of one of the

members of the Airport is chosen by the minority leader of the county legislature.  *Id.* at § 2753.

The Airport is authorized to finance, construct, develop, operate and maintain aviation and other

related facilities and services within the County of Monroe.  *See* Public Authorities Law § 2756.

## FACTS

### *Standard Parking And Mapco Have Been Business Partners For Decades*

15.     Standard Parking and Mapco have been joint venture partners for more than

twenty years.  Mapco is owned and controlled by the Goldsteins.

16.     The joint venture between Standard Parking and Mapco operates under the name

A-M Monroe Parking Company.

17.     Among other business ventures, Standard Parking and Mapco have managed and

operated the public parking facilities at the Greater Rochester International Airport under various

contracts with Monroe County and the Airport.  They have, as partners, jointly pursued this

profitable business for decades.

18.     The current parking services contract with the Airport commenced in January

2001.  On or about January 24, 2001, Standard Parking and Mapco signed a formal agreement

(the "Agreement") continuing and memorializing the joint venture between them to perform this

contract.

19.     Pursuant to the Agreement, Standard Parking and Mapco contributed equal

amounts of capital, and each party has a 50% interest in the joint venture and shares equally in

the profits and losses of the joint venture.  Each party has responsibility for, and control over, the

operations the joint venture business, as set forth in the Agreement.  Pursuant to the Agreement –

and as a matter of actual practice – Mapco and the Goldsteins were responsible for local matters affecting the joint venture, including cash control, on-site record keeping, control of operating expenses and liaison with the Airport; Standard Parking had general supervisory and operational control and was the managing agent for the joint venture.

20.     By virtue of their long-standing relationship, as well as the explicit terms of the Agreement, Standard Parking and Mapco, together with their respective officers and directors, were fiduciaries of each other, and owed each other duties of honesty, good faith and undiluted loyalty with respect to all matters concerning the business of their joint venture.

21.     The joint venture, A-M Monroe, was responsible for performing many tasks, including but not limited to, preparing operating budgets, keeping accurate records of all transactions and accounts, delivering daily revenue summaries, preparing inventory logs for all parking tickets used each day, staffing and operating booths, securing parking tickets, securing cash receipts, operating a shuttle bus system, handling damaged vehicle and other claims, providing customer assistance, removing snow and ice from the parking facilities, maintaining equipment, hiring and training necessary personnel, and operating an automated wireless system for scanning vehicles known as "Zoom Lane" – a proprietary system developed, patented and owned by Standard Parking – among other responsibilities.  These numerous responsibilities are set forth in the contract with the Airport, and in a detailed Standard Operating Procedures ("SOP") manual that is incorporated into the Current Contract.  The SOP manual was prepared by the joint venture for use at the Airport, and is derived from Standard Parking's standard SOPs that are used nationwide by Standard Parking.

22.     The Airport never expressed dissatisfaction to Standard Parking about the services that A-M Monroe provided.  The Airport also never complained to Standard Parking

that its services were too expensive, or otherwise indicated that its performance was
unsatisfactory.

<em>The Airport Gets A New Director, Who Orchestrates A Sham<br>
Competition To Steer A New Parking Contract To The Goldsteins</em>

23.     The Director of Aviation for the Airport, Terrence G. Slaybaugh, left his position
in 2006, and was succeeded by defendant David P. Damelio, who became the new acting
Director.  The Goldsteins, however, did not inform Standard Parking about this change in
leadership at the Airport until late August 2006.

24.     During the five-month period from mid-February 2006 to mid-July 2006, the
Goldsteins – through various entities they control – contributed more than $20,000 to Republican
party organizations and candidates, most of which went to a Monroe County Republican
organization.

25.     In 2006, the Goldsteins privately met with David P. Damelio.  Standard Parking
was not present for these meetings, but was told by the Goldsteins that they had discussed the
current contract, which expired by its terms on December 31, 2006, and started negotiations over
the three-year renewal term provided for in the current contract.

26.     The Goldsteins told Standard Parking that the negotiations were going well and
that they expected the Airport would extend the current contract for another three-year term.  On
information and belief, the Goldsteins misrepresented to Standard Parking the substance of their
conversations and negotiations with David P. Damelio and the Airport.

27.     In light of the Goldsteins' positive reports and assurances, Standard Parking was
surprised to learn – on August 28, 2006 – that David P. Damelio and the Airport had decided not
to extend the current contract.  Instead, David P. Damelio announced that the Airport planned to
engage in a national competition for a new contract to take effect on January 1, 2007.

28.     The Goldsteins professed surprise at this turn of events to Standard Parking, but also claimed that they did not have good working relationship with David P. Damelio, who supposedly disliked them.  The Goldsteins further asserted that their continued involvement with the business might be a liability to Standard Parking's chances of winning the new contract, and suggested that they should discontinue their involvement at the conclusion of the current contract.

29.     Fraud, corruption and political favoritism in a competitive procurement is fundamentally contrary to the strong New York public policy of fair and open competition in public contracts, and is illegal.

30.     On information and belief, the national competition announced by David P. Damelio on August 28, 2006, was a sham competition conceived and orchestrated by defendants in order to steer a contract to the Goldsteins and eliminate Standard Parking from any further participation, while maintaining the appearance of a *bona fide* competition.

31.     In furtherance of defendants' illegal objective, on September 22, 2006, David P. Damelio and the Airport issued an incomplete request for proposals (the "RFP"), launching a rushed procurement process that was inconsistent with the purported goal of full and open competition – but fully consistent with the goal of steering a contract to the Goldsteins in consideration of their large contributions to the Republican party.

32.     The Airport imposed inexplicably short deadlines considering the complexity of the parking operations and the Airport's requirements.  The Airport did not give itself sufficient time to prepare an adequate RFP.  The Airport only released the actual terms and conditions for the proposed new contract weeks after it issued its RFP.  Likewise, the Airport did not give offerors a reasonable amount of time to digest the RFP, including the many subsequent

clarifications to it, and to prepare thorough proposals that addressed the complexities of the work.

33.    Several qualified national firms participated in the RFP process, including Standard Parking, and on information and belief, these firms each submitted a detailed proposal. The Airport, however, only gave itself two or three days to analyze and evaluate these proposals, and could not have conducted a meaningful analysis and comparison of the proposals in such a short time.  Indeed, the Airport did not even hold discussions with Standard Parking (or, presumably, any other offeror) about its proposal and capabilities.

*In Furtherance Of Defendants' Scheme,*
*Mapco And The Goldsteins Deceive And Betray Their Long-Time Business Partner*

34.    Upon learning about the Airport's RFP, Jack Ricchiuto, an Executive Vice President of Standard Parking, spoke with Richard Goldstein, Mapco's President, about preparing and submitting a proposal to the Airport as a joint venture, thereby continuing their decades-long relationship and practice.

35.    Richard Goldstein, in response, said he was getting old and was tired of the business, and that there was not enough money in it anyway.  He told Standard Parking to pursue the opportunity on its own.  He did not inform Standard Parking, however, that he planned to submit a competing proposal for his own benefit, either through Mapco or some other entity that he controlled.

36.    Unaware of the Goldsteins' secret plan, Standard Parking asked defendants to serve as consultants to Standard Parking.  Defendants said they would "think about it" but ultimately declined the offer, claiming again that they wanted to exit the business.

37.    Instead of dealing honestly with their longtime joint venture partner, the Goldsteins and Mapco continued to deceive Standard Parking throughout the RFP process.  The

Goldsteins said on several occasions that their continued association with Standard Parking was a detriment and liability to Standard Parking's chances of winning the contract, citing a claimed animosity that the new acting Director of Aviation at the Airport, David P. Damelio, harbored toward defendants. In view of this supposed animosity, the Goldsteins consistently maintained that Standard Parking was better off without their continued participation.

38.     Standard Parking soon discovered that it was at a significant disadvantage in preparing its proposal because a key employee, the Resident Agent, who was intimately familiar with the operations of A-M Monroe, was out of the country and unreachable for approximately three weeks during this critical period of time. Standard Parking did not approve the Resident Agent's extended absence, and suspects that the Goldsteins authorized and orchestrated it.

39.     Unaware of defendants' plot, Standard Parking freely communicated with the Goldsteins about its proposal. In preparing its proposal, Standard Parking received and relied upon information from the Goldsteins about the operations and expenses of A-M Monroe, and revealed to them highly confidential competitive information about pricing and other material aspects of its proposal. On information and belief, the Goldsteins used this information, which they obtained under false pretenses, in responding to the RFP on their own behalf.

40.     When Standard Parking submitted a proposal on its own behalf to the Airport, it logically felt compelled to discuss the termination of the A-M Monroe joint venture and lack of further participation by the Goldsteins. Standard Parking, accordingly, told the Airport in its covering letter to the proposal that:

> MAPCO ownership has decided to discontinue their involvement in the management of the parking facilities at GRIA at the end of the current contract. Thus, Standard Parking Corporation is respectfully submitting a proposal as the sole managing agent. . .

41.     No one from the Airport, including David P. Damelio, ever questioned or challenged Standard Parking about this statement (or its obvious inaccuracy considering the fact that the Goldsteins, in fact, submitted their own proposal), and no one from the Airport ever asked why Standard Parking and Mapco abruptly decided to part ways after 20 years together.

*Although The RFP Specifications Were Clearly Designed With The Goldsteins In Mind,*
*The Goldsteins Actually Did Not Meet The Minimum Qualifications Of The RFP*

42.     As discussed in the following sections, the RFP process was infected with irregularities and violations of law. These flaws further confirm that the Airport's RFP was not a *bona fide* competition, but was instead a thinly-veiled scheme to rig the competition and steer a new contract to the Goldsteins.

43.     The RFP established certain minimum qualifications for offerors. Only offerors who could demonstrate that they possessed the prescribed minimum levels of experience were eligible for consideration under the RFP. Specifically, in order be considered for award by the Airport, offerors had to have:

> (1)     managed the operation of at least two (2) municipal/public parking facility containing no less than 2,500 parking spaces combined for 5 years; [and]
>
> (2)     managed the operation of at least one (1) Airport public parking facility containing no less than 3,000 parking spaces for 3 years.

44.     The RFP also required offerors to provide a "qualified Resident Agent" to oversee operations with "a minimum of 10 years experience as an Agent of an airport parking facility, with 6 of the 10 years in a management position."

45.     On information and belief, Mapco and the Goldsteins have never independently managed or operated an airport public parking facility containing 3,000 or more parking spaces, but have only done so in collaboration with, and with substantial support from, Standard Parking

and/or other large parking management companies.  Moreover, the current Resident Agent with overall responsibility and authority to assure A-M Monroe's performance is an employee of Standard Parking, and not an employee of Mapco.

46.     Although these RFP minimum specifications appear to have been formulated with the Goldsteins specifically in mind, Mapco and the Goldsteins, in actuality, do not independently meet these minimum qualifications; they only meet the minimum qualifications by virtue of their joint venture with Standard Parking.  Accordingly, any proposal submitted by them independently should not have even been considered by the Airport as eligible for award. The Airport nonetheless ignored its own minimum qualifications to select the Goldsteins as the winning proposer for the new contract.

### _The RFP Identified Six Evaluation Factors To Be Applied In Awarding The Contract, But The Airport Did Not Follow Them In Selecting Mapco And The Goldsteins_

47.     The RFP identified the selection method and criteria that the Airport would follow in selecting a winning proposal from among the **qualified** proposals that it received.

48.     Pursuant to the RFP, a Selection Committee composed of representatives of the Airport and Monroe County would evaluate, rate and rank proposals according to the six factors:

(1) "Experience in municipal/airport parking management and operations";

(2) "Expertise of Staff";

(3) "References";

(4) "Proposed SOP and Annual Budget";

(5) "Cost to [Airport]"; and

(6) "Prior/existing business relationship(s) with Monroe County and/or [Airport]."

49.     The RFP specified that any award would go to the proposal deemed "most advantageous" to the Airport, considering the above evaluation factors.

50.     Standard Parking timely submitted a comprehensive proposal to the Airport that met each and every one of the Airport's requirements.

51.     On information and belief, it is impossible that the Selection Committee could have considered the evaluation factors specified in the RFP, yet rationally conclude that Standard Parking's proposal was less advantageous to the Airport than the Goldsteins' proposal.

### *The RFP Restricted Communications With The Airport During The RFP,*
### *But Mapco And The Goldsteins Were Allowed To Violate Those Restrictions With Impunity*

52.     The RFP strictly prohibited communications between offerors and the Airport with regard to the RFP while the procurement process was pending, with few limited and carefully defined exceptions:

> From the date of issuance of this RFP until announcement of the
> successful Contractor, proposers may contact only the RFP
> Coordinator.  To maintain a fair and impartial competitive process,
> the RFP Coordinator will respond only to written questions
> (including electronic mail) submitted within the specified time frame.

The RFP's restrictions are consistent State Finance Law §§ 139-j and 139-k, which limit contacts between an offeror and a government entity relative to a procurement contract.

53.     By channeling all communications through a single point of contact, the integrity of the procurement process is protected.  Offerors are treated fairly and equally because no offeror has special access not available to all other offerors, or other unfair advantage.

54.     The RFP further required each offeror, as part of any proposal to the Airport, to sign and submit form affirmations disclosing any improper contacts with the Airport and affirming compliance with the restrictions against improper contacts.

55.     The Goldsteins had improper contacts with David P. Damelio (and possibly others) while the RFP process was pending.  Defendants admitted to Standard Parking that they had privately spoken with David P. Damelio about the RFP while the RFP was pending.

56.     Specifically, the Goldsteins claimed that David Damelio told them that the Airport would not award the new contract to a joint venture, even though the RFP itself contains no restrictions against joint ventures.  According to the Goldsteins, the Airport believed that the fees charged by joint ventures were too high because any fees needed to be shared by more than one party.  The Goldsteins claimed that this purported information confirmed their earlier statements that continuing the joint venture with Standard Parking would be harmful to Standard Parking's chances of winning the new contract.

57.     On information and belief, the Goldsteins' improper contacts with the Airport were more extensive, and different in substance, than they admitted to Standard Parking.

58.     David P. Damelio (and possibly others) knew or should have known such private contacts with Mapco and the Goldsteins regarding the RFP were improper.

59.     On information and belief, Mapco and/or the Goldsteins falsely affirmed to the Airport that they were complying with the provisions of the State Finance Laws and the RFP.

60.     David P. Damelio (and possibly others) knew or should have known that Mapco's and/or the Goldsteins' certifications concerning contacts with the Airport were false.

61.     Notwithstanding the foregoing violations of the RFP and State Finance Laws, David P. Damelio refused to disqualify Mapco and/or the Goldsteins from further consideration for award by the Airport.

*The RFP Prohibited Collusive Bidding Schemes, But*
*Mapco And The Goldsteins Engaged In Misconduct Amounting To Collusion*

62.     The RFP required each offeror, as part of any proposal to the Airport, to sign a "Non-Collusion Certificate" swearing that the prices in its proposal had been arrived at independently.  *See also* Public Authorities Law § 2878 (requiring offerors to submit sworn statements of non-collusion).

63.     When the RFP was first issued, Standard Parking discussed the RFP with Mapco and the Goldsteins in order to determine whether to submit a proposal on behalf of A-M Monroe – their joint venture – for a new contract.  As previously alleged, the Goldsteins told Standard Parking that they were no longer interested in continuing the business, that they were "tired" of the business, and that there was "not enough money in it" to make it worth their while.  They stated that Standard Parking should submit a proposal on its own behalf.

64.     Unaware of the Goldsteins' true intentions – and their plot with the Airport to rig the outcome of the purported competition – Standard Parking shared competitive confidential information with them concerning the preparation of its proposal, including information affecting pricing.  Standard Parking also received information from Mapco and the Goldsteins that it incorporated into its proposal.

65.     On information and belief, Mapco and the Goldsteins used the competitive information they obtained from Standard Parking (under false pretenses) to tailor their own proposal.

66.     Had Standard Parking known the truth about the scheme between the Goldsteins and the Airport, it would not have shared its proposal strategies with Mapco and the Goldsteins, and would not have uncritically relied upon the information it received from them.  Had Standard

Parking known that Mapco and the Goldsteins intended to submit their own proposal, Standard Parking would have submitted a different proposal to the Airport.

67.     The deceptive conduct of Mapco and the Goldsteins amounted to collusion that stifled full and open competition (to the extent that there was any *bona fide* competition).  Their misconduct tended to suppress competition because its main competitor for the new contract – Standard Parking – was misled into thinking that they did not intend to submit a proposal, and the Goldsteins were thus able to confidently propose higher prices than they might otherwise have proposed.

68.     The Goldsteins' deception and trickery gave them an unfair advantage in the purported competitive process.

69.     On information and belief, Mapco and the Goldsteins submitted a false "Non-Collusion Certificate" by failing to disclose that they had obtained, by false pretenses, information affecting the pricing (and other competitive information) of Standard Parking's proposal, and thus, that they had not "independently" arrived at the prices contained in their own proposal to the Airport.

70.     On information and belief, David P. Damelio and the Airport knew or should have known that Mapco and the Goldsteins had manipulated the procurement process by betraying and misleading Standard Parking and by obtaining access to confidential information about its proposal.

71.     Standard Parking told the Airport in its proposal that "MAPCO ownership has decided to discontinue their involvement in the management of the parking facilities at GRIA at the end of the current contract."  When, contrary to Standard Parking's representation, David P.

- 16 -

Damelio and the Airport received a competing proposal from the Mapco and the Goldsteins, they should have made appropriate inquiries.

72.    That no one from the Airport asked about this glaring and suspicious discrepancy, and that the Airport accepted the Goldsteins' uncompetitive and tainted proposal, is explainable only by the fact that the defendants worked together to rig the outcome of the purportedly competitive RFP process.

<u>Standard Parking Submits A Complete And Proper Proposal
And Later Discovers The Scheme</u>

73.    On October 26, 2006, Standard Parking received a letter from the Airport (dated October 20, 2006 and signed by David P. Damelio) informing it that "the RFP Selection Committee did not select Standard Parking" for the new contract.

74.    The Airport's determination to reject Standard Parking's proposal came as a surprise because Standard Parking believed that it was clearly more qualified than any of the other offerors that Standard Parking knew about.  Standard Parking called the Goldsteins to discuss the distribution of the joint venture's assets and ask who had been selected by the Airport for award.

75.    Standard Parking was shocked to learn during this call that Mapco and the Goldsteins had, in fact, surreptitiously submitted a proposal of their own, and that the Airport had determined to award the contract to Mapco and the Goldsteins.

**CAUSES OF ACTION**

**1st Cause Of Action – Breach Of Fiduciary Duty**
(against Mapco & Goldsteins)

76.    Standard Parking repeats and incorporates paragraphs 1 through 75 above, as though fully set forth herein.

77.     Mapco and its officers, directors and agents, the Goldsteins, owed Standard Parking a fiduciary duty arising from their decades-long relationship of trust and confidence as joint venture partners.

78.     As fiduciaries, the Goldsteins and Mapco were at all times bound to exercise honesty, good faith and undivided loyalty toward Standard Parking.

79.     As fiduciaries, the Goldsteins and Mapco were at all times required to act with Standard Parking's welfare and best interests in mind, and to refrain from acting for their own gain and advantage.

80.     The Goldsteins and Mapco, by secretly conspiring with David P. Damelio and others to end the existing joint venture contract and obtain the new contract for themselves, and by surreptitiously submitting a proposal on their own behalf (or on behalf of an entity they controlled) without informing Standard Parking, breached their fiduciary duties to Standard Parking.

81.     The Goldsteins and Mapco, by lying to and deceiving Standard Parking in order to manipulate the RFP process, breached their fiduciary duties to Standard Parking.

82.     The Goldsteins and Mapco, by diverting to themselves business opportunities that belonged to their joint venture with Standard Parking, breached their fiduciary duties to Standard Parking.

83.     The foregoing breaches of fiduciary duties were a substantial factor in causing Standard Parking to suffer damages and losses.

84.     The damages and losses suffered by Standard Parking as a result of the foregoing breaches of fiduciary duties include, but is not limited to, lost profits and opportunities for profit from contracts with the Airport.

85.     The Goldsteins' deliberate betrayal of Standard Parking, with fraudulent intent and in willful disregard of Standard Parking's rights and the public interest in full and open competition, is outrageous under the circumstances, and warrants the imposition of punitive damages against defendants.

**2d Cause Of Action – Aiding And Abetting Breach Of Fiduciary Duty**
(against the Goldsteins, David P. Damelio and John Does #1-10)

86.     Standard Parking repeats and incorporates paragraphs 1 through 85 above, as though fully set forth herein.

87.     Mapco owed its joint venture partner Standard Parking fiduciary duties of honesty, good faith and loyalty.

88.     The Goldsteins and David P. Damelio knowingly induced and caused Mapco to breach its fiduciary duties to Standard Parking.  On information and belief, there are others (John Does #1-10) who also knowingly induced and caused Mapco to breach its fiduciary duties to Standard Parking.

89.     Standard Parking has suffered damage and injury as a result of the breach, including but not limited to, lost profits and lost opportunities for profit.

90.     The defendants' actions in causing Mapco to breach the fiduciary duties owed to Standard Parking were acts of deliberate wrongdoing, committed under outrageous circumstances and with fraudulent intent and in deliberate disregard of Standard Parking's rights and the public interest in full and open competition, and warrant the imposition of punitive damages against them.

**3rd Cause Of Action – Fraud**
(against the Goldsteins)

91.     Standard Parking repeats and incorporates paragraphs 1 through 90 above, as though fully set forth herein.

92.     The Goldsteins falsely told Standard Parking that they were not interested in continuing to provide management or operating services at the Airport parking facilities, and made false statements that they did not intend to submit a proposal to the Airport.

93.     The Goldsteins, by virtue of their other statements and the fiduciary relationship with Standard Parking, were under a duty to disclose the fact that they intended to submit a proposal to the Airport.

94.     The Goldsteins fraudulently concealed from Standard Parking material information, namely, that they intended to and, in fact, prepared and submitted a proposal to the Airport, either in their own name or through an entity they controlled.

95.     The Goldsteins made their false statements to Standard Parking, and concealed material information from Standard Parking, with the intent to deceive Standard Parking, to induce Standard Parking to reveal information about its proposal to the Airport, and to influence the substance of Standard Parking's proposal to the Airport.

96.     Standard Parking relied upon the Goldsteins' fraudulent misrepresentations and concealment in preparing its proposal for the Airport and in freely sharing information about its proposal with defendants.

97.     As a result of the Goldsteins' fraudulent conduct, Standard Parking suffered injury and damages, including but not limited to, costs incurred in preparing its proposal, the value of the competitive information that Standard Parking provided to the Goldsteins, the management fees it would have earned under a contract with the Airport, and the value of the

knowledge, know-how and goodwill created over the years by the parties' joint venture,

including the SOPs, which defendants arrogated to themselves.

98.     The Goldsteins' fraud is gross and involves a high degree of moral culpability.

The Goldsteins, by their misconduct, tainted and undermined the competitive procurement

process, thereby depriving the general public of the benefits of full and open competition.

Accordingly, the imposition of punitive damages against defendants is warranted.

### 4th Cause Of Action – Fraud
(against David P. Damelio and John Does #1-10)

99.     Standard Parking repeats and incorporates paragraphs 1 through 98 above, as

though fully set forth herein.

100.     David Damelio and John Does 1010 falsely represented (or caused to be falsely

represented) that the Airport intended to engage in a *bona fide* competitive RFP process, and

fraudulently concealed that its true purpose was to steer the new contract to the Goldsteins and/or

an entity that they controlled.

101.     Defendants made their false statements to Standard Parking with the intent to

deceive Standard Parking, the other offerors and the public generally, and to conceal the true

goal and purpose of the RFP process.

102.     Standard Parking relied upon defendants' fraudulent misrepresentations and

concealment, which induced it to expend considerable time and effort in preparing a proposal for

the Airport.

103.     As a result of defendants' fraudulent conduct, Standard Parking suffered injury

and damages, including but not limited to, the costs it incurred in connection with preparing its

proposal.

104.    Defendants' fraud is gross and involves a high degree of moral culpability. Defendants, by their misconduct, tainted and undermined the competitive procurement process, thereby depriving the general public of the benefits of full and open competition.  Accordingly, the imposition of punitive damages against defendants is warranted.

### 5th Cause Of Action – Misappropriation
(against Mapco and the Goldsteins)

105.    Standard Parking repeats and incorporates paragraphs 1 through 104 above, as though fully set forth herein.

106.    During the course of the parties' joint venture, the parties developed and created SOPs that were applied by the joint venture in managing and operating its business and the Airport parking facilities.

107.    These SOPs were originally derived from Standard Parking's standard SOPs used by Standard Parking nationwide.

108.    The SOPs are novel and original, are not generally known, have value, and confer a competitive advantage upon those who know and use them.

109.    On information and belief, Mapco and the Goldsteins misappropriated the SOPs for their own benefit, without the consent of Standard Parking, by incorporating them into the proposal that they submitted to the Airport, and Mapco and the Goldsteins intend to use the SOPs in performing any new contract awarded by the Airport.

110.    Mapco and the Goldsteins are liable to Standard Parking for the reasonable value of the SOPs.

### 6th Cause Of Action – Tortious Interference With Prospective Advantage
(against all defendants)

111.     Standard Parking repeats and incorporates paragraphs 1 through 110 above, as though fully set forth herein.

112.     Defendants knew that Standard Parking proposed to enter into a contract with the Airport to manage and operate the Airport's parking facilities.

113.     By their breaches of fiduciary duties, fraud and other misconduct alleged herein, defendants intentionally interfered with and prevented Standard Parking from entering into the proposed contract with the Airport.

114.     But for defendants' misconduct, there is a high probability that Standard Parking would have entered into the proposed contract with the Airport.

115.     Defendants used wrongful means to interfere with the prospective advantage of Standard Parking, including by directly communicating with David P. Damelio, acting Director of Aviation, in violation of the RFP and State Finance Law provisions restricting contacts with the Airport and by fraudulently inducing Standard Parking into sharing confidential information about its proposal, thereby undermining the competitive procurement process.

116.     As a result of defendants' wrongful actions, Standard Parking did not win the contract with the Airport and suffered damage and injury.

### 7th Cause Of Action – 42 U.S.C. § 1983
(David P. Damelio, the Goldsteins, and John Does #1 -10)

117.     Standard Parking repeats and incorporates paragraphs 1 through 116 above, as though fully set forth herein.

118.    Section 1983 of Title 42 of the United States Code imposes liability upon those who, under color of law, deprive any person (of cause the deprivation) of any rights, privileges or immunity secured by the Constitution and the laws.

119.    The Equal Protection clause of the Fourteenth Amendment guarantees to Standard Parking the right to receive equal treatment as other, similarly-situated persons.  The Equal Protection clause protects Standard Parking against being treated differently from similarly-situated persons for arbitrary, irrational or impermissible reasons or considerations.

120.    David P. Damelio, acting under color of law, the Goldsteins acting in conspiracy with David P. Damelio, and John Does #1-10, acting under color of law and/or in conspiracy with David P. Damelio and/or other government officials, intentionally treated Standard Parking differently from Mapco and the Goldsteins.

121.    Standard Parking's treatment at the hands of David P. Damelio, the Goldsteins and/or John Does #1-10 was not motivated by legitimate governmental objectives, but was instead motivated by illegal favoritism related to partisan politics and a desire to reward loyal party contributors by handing out a lucrative contract.  This motivation is totally improper illegal and illegal under clear New York law and violates the clear New York policy favoring fair and open competition for public contracts.

122.    Standard Parking's treatment at the hands of David P. Damelio, the Goldsteins, and/or John Does #1-10 bore no rational relationship to the accomplishment of the work of the Airport, and had no rational basis.

123.    Although the law vests David P. Damelio and John Does #1-10 with discretion in choosing a parking services contractor in accordance with the criteria announced in the RFP, that discretion clearly and plainly does not include the discretion to conduct a sham procurement.

Schemes to distribute public moneys to political cronies are not "discretionary functions" of a

government official sufficient to bestow qualified immunity.

124.    Standard Parking suffered injury as a result of the foregoing deprivations of its

Fourteenth Amendment rights.

### 8th Cause of Action – Civil Conspiracy
(Against all Defendants)

125.    Standard Parking repeats and incorporates paragraphs 1 through 124 above, as

though fully set forth herein.

126.    On information and belief, David P. Damelio and the Goldsteins conspired with

other unknown persons to plan and implement their scheme to steer the Airport parking contract

to the Goldsteins and to engage in the illegal conduct alleged in the causes of action alleged

above.

127.    The unknown persons are identified as John Does #1-10.  If and when Standard

Parking learns the identities of such unknown co-conspirators, Standard Parking will amend this

complaint accordingly.

128.    David P. Damelio, the Goldsteins and all unknown co-conspirators are jointly and

severally liable to Standard Parking for each and every one of the damages it has suffered as a

result of the wrongdoing alleged herein.

### PRAYER FOR RELIEF

Standard Parking respectfully asks the Court to grant the following relief to redress the

injuries caused by defendants' misconduct:

a.    damages for violating Standard Parking's rights to Equal Protection under the

Fourteenth Amendment in an amount to be proved, including punitive damages for willful

misconduct and acting with an improper motive;

b.      imposition of a constructive trust upon Mapco and the Goldsteins for Standard Parking's share (50%) of any fees paid by the Airport to these defendants, and/or any other financial benefit realized by these defendants, under a new contract to manage and operate the Airport's parking facilities;

c.      damages for lost management fees in the approximate amount of $2,400,000, or such other amount as may be proved;

d.      damages for the reasonable value of the SOPs in the approximate amount of $10,000, or such other amount as may be proved;

e.      damages in the approximate amount of $10,000 for the costs of the preparing the proposal, or such other amount as may be proved;

f.      damages for lost profits in the approximate amount of $650,000, or such other amount as may be proved;

g.      punitive damages in the amount of $5,000,000, or such other amount as may be proved;

h.      reasonable attorneys' fees and other expenses incurred Standard Parking in bringing this action; and

i.      any other relief that the Court deems just and equitable.

Respectfully submitted,

NIXON PEABODY LLP

_____/s/_____
John J. Field
1100 Clinton Square
Rochester, NY 14604
Tel: (585) 263-1000
Fax: (585) 263-1600

Attorneys for Standard Parking Corporation

Dated: December 11, 2006